UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| TARA PENNINGTON, | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | CASE NO. 7:12-cv-860-SLB |
| | } | |
| WAL-MART STORES EAST, LP, | } | |
| | } | |
| **Defendant.** | } | |

**MEMORANDUM OPINION**

This case is currently before the court on defendant Wal-Mart's Motion for Summary

Judgment, (doc. 20),[1] defendant's Objections to Plaintiff's Evidence Offered in Opposition

to Summary Judgment ("Motion to Strike"), (doc. 27), and plaintiff's Motion for Protective

Order, (doc. 28). Plaintiff's remaining claims allege that defendant, her former employer,

discriminated and retaliated against her based on her son's disabilities in violation of the

Americans with Disabilities Act ("ADA"). (*See* doc. 1; doc. 19.) Upon consideration of the

record, the submissions of the parties, the arguments of counsel,[2] and the relevant law, the

court finds that defendant's Motion for Summary Judgment, (doc. 20), is due to be granted.

Defendant's Motion to Strike and plaintiff's Motion for Protective Order are immaterial to

the disposition of plaintiff's claims and therefore will be denied as moot.

---

[1] Reference to a document number, ("Doc. ___"), refers to the number assigned to each
document as it is filed in the court's record.

[2] Following oral argument on defendant's Motion for Summary Judgment, plaintiff's
counsel moved to withdraw from representing plaintiff. By separate order, the Motion to
Withdraw as Counsel, (doc. 32), will be granted.

## SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure ("the Federal Rules"),

summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23

(1986); *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir.

2001).  The moving party bears the initial burden of demonstrating the absence of a genuine

issue of material fact and that it is therefore entitled to judgment as a matter of law.  *See*

*Celotex*, 477 U.S. at 323*; Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

Once the moving party has met its burden, Rule 56(e) of the Federal Rules requires that the

nonmoving party go beyond the pleadings and show that there is a genuine issue for trial.

*See* Fed. R. Civ. P. 56(e); *see also Celotex*, 477 U.S. at 324–25.  "There is a genuine issue

of material fact if the nonmoving party has produced evidence such that a reasonable

factfinder could return a verdict in its favor." *Waddell*, 276 F.3d at 1279; *see also Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Anderson*, 477 U.S. at 249.  Determining credibility, weighing evidence, and

drawing legitimate inferences from the facts are all functions of the jury, *see id.* at 255;

therefore, the court must accept as true all evidence favoring the nonmoving party and draw all justifiable inferences from the evidence in that party's favor. Nevertheless, the nonmoving party need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## STATEMENT OF FACTS

Plaintiff's minor son has asthma and autism. (Doc. 21-1 (Pennington Depo. at 32-33).) During the relevant time period, plaintiff's disabled mother and plaintiff's niece lived with plaintiff and sometimes cared for plaintiff's son. (*Id.* at 15 & 121.) In June 2010, plaintiff took a part-time Cashier position in the Money Center at Wal-Mart Store 715, owned by defendant. (Doc. 21-3 at 5.) During her hiring interview with Wal-Mart supervisors Arthur Gibson, Terry Winters, and Stephanie Owens, she was asked if anything could hinder her performance at work. (*Id*. at 116:23-117:22, 120:18-122:8.) Plaintiff told them that she had an autistic son who sometimes caused her to be absent. (*Id*. at 121:6-8.) They responded: "Okay, that shouldn't be a problem." (*Id*. at 122:13.) She had many subsequent[3] conversations with Winters and Owens about her absences and they told her that it "shouldn't be a problem most of the time, unless it was unexcused," or "it shouldn't be a problem as long as it's for your son." (*Id*. at 122:21-123:10.)

---

[3]The timing of these alleged conversations is never identified.

Wal-Mart's Attendance/Punctuality policy provides that four unexcused absences in a rolling six-month period subjects an employee to disciplinary action, including termination when the employee has received prior "coaching." (Doc. 21-3 at 6-7 ("If you have excessive absences or incomplete shifts . . . you will be subject to disciplinary action, up to and including termination. . . . If you have more than three unexcused absences in a rolling six month period, you will be subject to disciplinary action. If you have an active coaching for any reason . . . you advance to the next coaching level if you develop four unexcused absences."); doc. 22-1 at 7 ("If you receive a coaching and your job performance or conduct remains unacceptable, we will terminate employment.").) Authorized absences, including those for "reasonable accommodation" and "extraordinary circumstances approved by [Market Human Resources Manager]," are not considered part of an employee's attendance record and do not result in disciplinary action. (Doc. 21-3 at 6.)

On November 30, 2010, after plaintiff had accumulated six unauthorized absences on her attendance report, plaintiff was told that she had accumulated six points and was given a verbal warning or coaching regarding her attendance. (Doc. 21-1 (Pennington Depo. at 190:20-192:9).) She responded, "You do understand that most of those are for my son." (*Id*. at 192:7-9.) She knew her attendance needed to improve, but she did not know how it could be helped. (*Id*. at 193:5-7.) Realizing that she could be held accountable for absences occasioned by her son's disabilities, she tried hard from that point on not to be absent. (*Id*. at 194:11-18.) She also asked about applying for FMLA leave and was told what she needed

and that upon bringing the paperwork back she "should be good." (*Id*. at 133:9-134:17.)

Plaintiff's supervisors told her that FMLA would provide a "reasonable accommodation" for

her son's autism so that she would not receive points because of him. (*Id*. at 161:21-162:10.)

Though she was trying not to be absent, Christmas time was apparently difficult and

on January 2, 2011, after receiving her ninth absence-related point, she was given a written

coaching from Shakillia "Shea" Sanders, her supervisor. (Doc. 21-3 at 18; doc. 21-1

(Pennington Depo. at 116:8-21, 198:18-203:21, 206-209).) During plaintiff's discussion with

Sanders, Sanders said something to the effect of "You mean you really missed this much

work because of your child . . . because everybody thinks he looks normal." (*Id*. at 210.)

Winters and Owens made similar statements. (*Id*.)

Plaintiff had a few excused absences in late January 2011. (*Id*. at 216-218.) On

February 5th, following an incident where she refused to go on an early break, she was given

a "Decision Day" written coaching charging her with insubordination. (*Id*. at 219 & 222; doc.

21-3 at 19.) Plaintiff requested to speak with the shift manager, David Roberts. (Doc. 21-1

(Pennington Depo. at 240).) Roberts told her to write down how she can "fix [her] problem

that's causing [her] to be late or be tardy." (*Id*.) Plaintiff took the opportunity to explain her

situation with her job and her family in detail. (*See* doc. 21-3 at 20-22.) She wrote that she

did not like "being a rag doll" (apparently referencing the strain of being "pulled" from her

assigned work in the Money Center to do other work on "the floor" of the store), that only

three of her eleven absence-related points are "for [her]," that the rest were from her son and

5

his disabilities, and that she "let Wal-Mart know that [her] son was a disabled child and yet, they still hired [her] knowing full well what 'disabled child' meant." (*Id*.) She also wrote: "Recently I have been told that I need to find a way to 'fix this,' and in all honesty I can try to not miss work, but I cannot promise anything," because her son's disabilities were not curable. (*Id*.)

Plaintiff applied for an accommodation for her son's disabilities on February 9, 2011. (Doc. 21-3 at 28.) On February 19, 2011, plaintiff applied for intermittent FMLA leave to care for her son. (Doc 21-3 at 24.)

Plaintiff received a tenth point for an unexcused absence on February 26th, when her son had an asthma attack, and an eleventh point for her unexcused absences on March 6th and 7th, 2011, when her son was in the hospital. (Doc. 21-1 (Pennington Depo. at 269:20-272:12); doc 21-3 at 15.) Plaintiff was fired on March 11, 2011. (Doc. 21-3 at 23.) Her exit interview statement says that she was "terminated for her attendance of having 11 attendance points." (*Id*.)

Shakillia Sanders, Trina Peppers, Karen Estes, and Terry Winters conducted plaintiff's termination meeting or exit interview. (Doc. 21-1 (Pennington Depo. at 274:19-21).) They told her that her FMLA application had been denied.[4] *(Id*. at 275.) Sanders asked why plaintiff could not "get on disability for [her] son's disabilities." (*Id*. at 276.) They told her that she was being fired for her absences. (*Id*. at 278.) Plaintiff said, "So you're basically

---

[4]It is undisputed that plaintiff was not qualified for FMLA leave, having worked less than 1,250 hours as required by 29 U.S.C. § 2611(2). (*See* doc. 21-3 at 24; doc 22-7 at ¶ 5.)

terminating me for missing all these days that I got told would be okay," or, "So I'm being

terminated for my son keeping me from work." (*Id*. at 278.) Sanders nodded affirmatively.

(*Id*. at 278 & 280.)

### ANALYSIS

**1. ADA Discrimination**

"The ADA . . . defines the term 'discriminate' to include, among other factors,

'excluding or otherwise denying equal jobs or benefits to a qualified individual because of

the known disability of an individual with whom the qualified individual is known to have

a relationship or association.'" *Hilburn v. Murata Elec. N. Am., Inc.*, 181 F.3d 1220, 1230

(11th Cir. 1999) (quoting 42 U.S.C. § 12112(b)(4)).[5] "The familiar burden-shifting analysis

---

[5]The ADA provides:

(a)  General rule
No covered entity shall discriminate against a qualified individual on the
basis of disability in regard to job application procedures, the hiring,
advancement, or discharge of employees, employee compensation, job
training, and other terms, conditions, and privileges of employment.
(b)  Construction
As used in subsection (a) of this section, the term "discriminate against a
qualified individual on the basis of disability" includes –
. . .
> (4)  excluding or otherwise denying equal jobs or benefits to a
> qualified individual because of the known disability of an individual
> with whom the qualified individual is known to have a relationship
> or association . . . .

42 U.S.C. § 12112(a)-(b).

of [*McDonnell Douglas*] is equally applicable to ADA claims."[6]  *Id*. at 1226 (citing *Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996)).

> *McDonnell Douglas* and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases.  First, the plaintiff must establish a prima facie case of discrimination.  . . .  The burden [then] shift[s] to [the defendant] to produce evidence that the plaintiff was [terminated] for a legitimate, nondiscriminatory reason.   This burden is one of production, not persuasion; it can involve no credibility assessment.  [When the defendant offers] admissible evidence sufficient for the trier of fact to conclude that [the plaintiff] was fired [for a legitimate, nondiscriminatory reason], the *McDonnell Douglas* framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination vel non . . . .

> Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  And in attempting to satisfy this burden, the plaintiff – once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision – must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.  That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence.

*Reeves v. Sanderson Plumbing Products, Inc.*,   530 U.S. 133, 142-43 (2000) (internal citations and quotations omitted).

---

[6]Although plaintiff notes that the *McDonnell Douglas* framework is not the only way for a plaintiff to survive summary judgment, and states that the "direct method is appropriate here," (doc. 24 at 13), plaintiff does not actually argue the case using the direct method of constructing a "convincing mosaic of circumstantial evidence" of discrimination, *see Smith v. Lockheed-Martin Corp*., 644 F.3d 1321, 1328 (11th Cir. 2011). Therefore, the court need not depart from the familiar *McDonnell Douglas* framework in its analysis.

In this circuit –

> A plaintiff attempting to establish a prima facie case of "association discrimination" under the ADA must establish: (1) that she was subjected to an adverse employment action; (2) that she was qualified for the job at that time; (3) that her employer knew at that time that she had a relative with a disability; and (4) that "the adverse employment action occurred under circumstances which raised a reasonable inference that the disability of the relative was a determining factor in [the employer's] decision."

*Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001) (quoting *Hilburn*, 181 F.3d at 1230-31).  To satisfy the fourth prong of the prima facie case, plaintiff must show that her son's disability was a determining factor in defendant's decisions to terminate her.

**a. Prima Facie Case**

This case turns on a plain question of law. The court will assume that plaintiff was fired because she missed days of work caring for her disabled son. And in the light most favorable to plaintiff, the facts could show that although defendant initially told her that her absences related to her son's disability would not count against her, some of those absences did. In short, the court will assume that plaintiff was subjected to an adverse employment action, that she was qualified for her job, and that defendant knew about her son's disabilities. The question is whether either (1) not excusing plaintiff's association-related absences, or (2) not telling plaintiff up front that those absences will not be excused, are "circumstances which raise[] a reasonable inference that the disability of the relative was a determining factor in [the employer's] decision." *Wascura*, 257 F.3d at 1242. The answer is no.

The Seventh Circuit has divided association claims into "three types of situations" that support an inference that the employee's association with a person with a disability was a determining factor in the employer's adverse employment decision: "[1] 'expense,' [2] 'disability by association,' and [3] 'distraction.'" *Larimer v. Int'l Bus. Mach. Corp.*, 370 F.3d 698, 700–01 (7th Cir. 2004); *see also Trujillo v. PacifiCorp*, 524 F.3d 1149, 1155 (10th Cir. 2008) (quoting *Larimer*).

> [The three situations] can be illustrated as follows: an employee is fired (or suffers some other adverse personnel action) because (1) ("expense") his spouse has a disability that is costly to the employer because the spouse is covered by the company's health plan; (2a) ("disability by association") the employee's homosexual companion is infected with HIV and the employer fears that the employee may also have become infected, through sexual contact with the companion; (2b) (another example of disability by association) one of the employee's blood relatives has a disabling ailment that has a genetic component and the employee is likely to develop the disability as well (maybe the relative is an identical twin); (3) ("distraction") the employee is somewhat inattentive at work because his spouse or child has a disability that requires his attention, yet not so inattentive that to perform to his employer's satisfaction he would need an accommodation, perhaps by being allowed to work shorter hours. The qualification concerning the need for an accommodation (that is, special consideration) is critical because the right to an accommodation, being limited to disabled employees, does not extend to a nondisabled associate of a disabled person. 29 C.F.R. § 1630.8; *Den Hartog v. Wasatch Academy*, 129 F.3d [1076,] 1083–85 [(10th Cir.1997)]; *Tyndall* [*v. Nat'l Educ. Centers, Inc. of Cal.*], 31 F.3d [209,] 214 [(4th Cir. 1994)].

*Larimer*, 370 F.3d at 700–01.

Plaintiff's claim is of the last sort, "distraction." But plaintiff's child's disabilities did not merely cause her to step out to take an emergency phone call every now and then. His disabilities allegedly caused her to miss multiple days of scheduled work per month. What

plaintiff needed, and what defendant allegedly initially led her to believe she had, was an accommodation: to miss work whenever her child's disabilities required her. But federal law does not require employers to make reasonable accommodations for employees to care for their disabled relatives. *See Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 337 (7th Cir. 2012) (citing *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 511 (3d Cir. 2009), and *Tyndall*, 31 F.3d at 214). If such an employee "violates a neutral employer policy concerning attendance or tardiness, he or she may be dismissed even if the reason for the absence or tardiness is to care for the [disabled associate]." *Hilburn*, 181 F.3d at 1231 (citations omitted). Therefore, not excusing plaintiff's association-related absences does not raise a reasonable inference that plaintiff's son's disabilities were a determining factor in defendant's decision to fire her.

Nor does not telling plaintiff up front that her association-related absences will not be excused. It would certainly be objectionable to tell an employee that no absence related to the employee's disabled relative will count against her, and as her absences accumulated *to continue to affirm* the employee's belief that they had been and were being excused, only to fire her upon reaching a certain threshold. But that is not what happened in this case, because plaintiff knew after her sixth absence point that her attendance—regardless of its relationship to her son—was under scrutiny. *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001) ("[A]n employer who goes beyond the demands of the law to help a disabled employee incurs no legal obligation to continue doing so."). After her ninth absence, she was

again told that her attendance was a problem that she needed to fix. While this problem might have seemed incurable to her since it was attributable to her son's disabilities, she cannot now complain that defendant was leading her to the brink of termination blindfolded.

A jury might believe that plaintiff was terminated because of absences related to her son's disabilities, but she cannot show that defendant *discriminated* against her in violation of the ADA by doing so. Thus, the court need not decide the merit of defendant's Motion to Strike, (doc. 27), which objects to evidence supporting the fact that most of her absences were related to her son's disability, or the merit of plaintiff's opposition in the form of a Motion for Protective Order, (doc. 28). Because plaintiff has not shown a prima facie case of ADA discrimination, defendant's Motion for Summary Judgment on that claim is due to be granted.

**2. ADA Retaliation**

Pursuant to the ADA, "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge . . . or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). "This provision creates a prohibition on retaliation under the ADA that is similar to Title VII's prohibition on retaliation. Accordingly, [the court] assess[es] ADA retaliation claims under the same framework [it] employ[s] for retaliation claims arising under Title VII." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997) (citation omitted).

**a. Prima Facie Case**

"In order to prove an ADA retaliation claim, a plaintiff must show that: (1) [she] engaged in conduct protected by the ADA; (2) [she] was subjected to an adverse employment action at the time, or after the protected conduct took place; and (3) the defendant took an adverse employment action against [her] because of [her] protected conduct." *Collado v. United Parcel Service*, 419 F.3d 1143, 1158 (11th Cir. 2005) (internal quotations and citation omitted).

Plaintiff argues that she engaged in protect conduct by: complaining of her treatment to Roberts, (doc. 21-1 (Pennington Depo. at 254-256 (that she was being pulled around like a rag doll), 268 (that she was being picked on))), writing a letter at Roberts's behest, (doc. 21-3 at 20-22), requesting accommodation to care for her son, (doc. 21-3 at 28), and requesting FMLA leave to care for her son, (doc. 21-3 at 24). (Doc. 24 at 16-17.)

Plaintiff's oral complaints to Roberts are generalized workplace grievances without an expressed or implied link to the ADA. (Doc. 21-1 (Pennington Depo. at 254-256 (being pulled around like a rag doll), 268 (picking on her))); *see Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010) (quoting the EEOC manual in holding that the complaint must at least imply that treatment is *unlawful*). Her letter reminds the reader that her son is disabled, and promises that FMLA papers are on the way, but stops far short of implying that Wal-Mart's treatment of her is in any way unlawful, or that she is legally entitled to miss

days to care for her disabled child without consequence. (*See* doc. 21-3 at 20-22.) Therefore, her letter and oral complaints to Roberts are not protected conduct.

Plaintiff's request for FMLA leave is not an opposition to an act or practice made unlawful by the ADA, nor is it an exercise of a right granted or protected by the ADA, and thus it is not protected conduct under the ADA. *See* 42 U.S.C. § 12203.

Defendant argues that the court should not consider plaintiff's oral and written requests for accommodation because plaintiff did not frame these facts as the basis of her retaliation claim in her complaint, and thus her attempt to use them now is an improper attempt to amend her complaint.[7] (Doc. 26 at 8 n.3.) Defendant is correct. And even if they were considered, and if the court assumed that plaintiff could make a prima facie case out of the circumstances surrounding her written accommodation request,[8] (doc. 21-3 at 28), the claim would fail in the pretext stage.

---

[7] Defendant also points out that plaintiff never included in her deposition her requests as a basis for her belief that she had been retaliated against. (Doc. 26 at 8 n.3.)

[8] Plaintiff's oral requests cannot form the basis of a retaliation claim because they occurred long before her termination, and defendant at least initially attempted to comply with them by excusing some of her absences related to her son's disabilities. As plaintiff has pointed out, defendant hired her knowing that her son was autistic and caring for him might cause her to be absent. (*See* doc. 24 at 18.) There is no evidence on which a reasonable jury could find that defendant fired her because of those same oral requests.

**b. Pretext**

"Once a prima facie case is established, the burden then shifts to the defendant employer to come forward with legitimate non-discriminatory reasons for its actions that negate the inference of retaliation. The plaintiff must then demonstrate that it will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997).

Defendant has put forth a legitimate nondiscriminatory reason for firing her: she accumulated too many absence points. (Doc. 20-1 at 29.) Plaintiff argues that this is not the real reason she was fired because defendant assured her that the absences related to her son's disability would be excused and that she could use FMLA leave to care for her son. (Doc. 24 at 20.) The real reason defendant fired her, goes the argument, is that she finally turned in paperwork requesting an accommodation to which she was not entitled.

This argument covers the same ground as her discrimination argument, and fails for a reason identified above: defendant informed plaintiff that her absences were counting against her and that she needed to fix her absence problem. Defendant did not excuse all absences as they occurred and then all of the sudden—upon learning that plaintiff had formally requested an accommodation—change course and fire her for previously excused absences. That would be the sort of "ruse" from which plaintiff could show pretext. Here however, defendant consistently disciplined plaintiff for accumulating more and more

15

absence points. Thus, plaintiff has no evidence to undermine the proposition that it was her

absences that were the real reason she was fired, and her retaliation claim fails.

## CONCLUSION

For the reasons stated above, defendant's Motion for Summary Judgment, (doc. 20),

is due to be granted. Defendant's Motion to Strike, (doc. 27), and plaintiff's Motion for

Protective Order, (doc. 28), are immaterial to the disposition of this case and thus due to be

denied. An order in accordance will be entered contemporaneously with this opinion.

**DONE**, this 26th day of March, 2014.

*Sharon Lovelace Blackburn*
_____
SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE